UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DANIEL J. BERULIS,
[Address filed under seal]
Attachmenttoobig@gmail.com

        Plaintiff,

  v.

ELON MUSK
500 Center Ridge Dr.
Austin, TX 78753

        Defendant.

Civil Action No. _____

Case: 1:26-cv-01319    JURY DEMAND
Assigned To : Unassigned
Assign. Date : 4/17/2026
Description: Pro Se Gen. Civ. (F-DECK)

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Daniel J. Berulis ("Plaintiff") alleges as follows against Defendant Elon Musk ("Defendant"):

### I. BACKGROUND

1.On April 19, 2025, Defendant published a post on Twitter (https://www.x.com) stating: "Filing a deliberately false whistleblower claim is a serious crime." (the "April 19th Post"). That statement appeared directly above an embedded preview card displaying Plaintiff's full legal name and photograph, linking to a story asserting the "whistleblower" was "caught lying." (Ex. A.)

2.Defendant authored the sentence. Defendant selected and attached the preview card displaying Plaintiff's name and photograph. Defendant published the sentence and the preview card together as a single amalgamation.

**RECEIVED**

APR 17 2026

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

3. The accusation is false. Plaintiff did not file a deliberately false whistleblower disclosure.

4. As of the filing of this Complaint, the April 19th Post reflects approximately 41.2 million views, more than 14,000 replies, approximately 4,700 bookmarks, more than 40,000 reposts, and approximately 164,000 likes. (Ex. A.)

5. The publication caused concrete harm in the District of Columbia, where Plaintiff's federal employment reputation and professional opportunities are materially centered, including reputational injury, economic loss, harassment, and property damage with related safety mitigation costs.

## II. JURISDICTION, VENUE, AND CHOICE OF LAW

6. This Court has subject-matter jurisdiction. Plaintiff is domiciled in Maryland. Defendant is domiciled in Texas. The amount in controversy exceeds $75,000.

7. Plaintiff lives in Maryland but has worked and seeks work in a trust-sensitive and clearance-sensitive federal IT market centered in the District of Columbia. Plaintiff's professional reputation with federal agencies, federal contractors, congressional stakeholders, and related decisionmakers has a substantial connection to D.C.

8. This Court has specific personal jurisdiction over Defendant because Defendant caused tortious injury in the District by an act outside the District, the publication referenced a District-specific incident, and the publication was not only directed to but caused injury within the District's unique federal employment ecosystem.

9. Defendant has engaged in a persistent course of conduct within the District of Columbia. Upon information and belief, Defendant was physically present in Washington, D.C. on multiple occasions in late 2024 and early 2025, including a Capitol Hill meeting with Senate

leadership on December 5, 2024; participation in a D.C.-based inauguration event on January 20, 2025; attendance at a Cabinet meeting on February 26, 2025; and meetings with members of Congress on March 5, 2025. On information and belief, in early 2025, Defendant maintained a physical working presence in federal office space in Washington, D.C. and was sleeping in the Eisenhower Executive Office Building. (Ex. R.)

10. Defendant derives substantial economic benefit from continuous business relationships centered in Washington, D.C. through entities he owns and controls.

    a. Space Exploration Technologies Corp. ("SpaceX"), an entity controlled by Defendant, holds billions of dollars in federal contracts administered by agencies headquartered in Washington, D.C., including a $2.89 billion Human Landing System contract with NASA and national security launch contracts with the Department of Defense.

    b. Entities controlled by Defendant, including Tesla, Inc. and SpaceX, maintain registered federal lobbying operations in Washington, D.C., and regularly engage with federal officials and agencies pursuant to the Lobbying Disclosure Act.

11. The subject matter of the April 19th Post, Plaintiff's whistleblower disclosure while at the National Labor Relations Board, an independent federal agency headquartered in Washington, D.C., arose from events occurring in the District.

12. Plaintiff's injury in the District was real and foreseeable. The threads following the April 19th Post included responses from District-based federal officials, including U.S. Representative Nancy Mace, who responded publicly to the Post on April 21, 2025, calling for punitive action. (Ex. B-6.) The Post was published four days before Plaintiff's scheduled

testimony before the Office of Special Counsel and before scheduled testimony about Plaintiff's report to the House Oversight Committee in Washington, D.C.

13. Plaintiff respectfully requests jurisdictional discovery if, and to the extent, Defendant disputes facts material to personal jurisdiction.

14. Venue lies in this District because a substantial part of the events occurred here.

15. Plaintiff's primary plea for these claims is under District of Columbia law. If the Court determines that Maryland law governs any issue, Plaintiff pleads the same claims in the alternative under Maryland law, or if deemed Virginia, then tertiarily under Virginia law.

### III. PARTIES

16. Plaintiff, Daniel J. Berulis, is a citizen of Maryland and is an active clearance-holding federal IT professional. Plaintiff submitted his whistleblower disclosure through official legal and required channels, and only after exhausting other, less public methods.

17. Plaintiff is not a public official. Plaintiff does not use any public platform to communicate en masse and does not enjoy publicity.

18. Before the April 19th Post, Plaintiff did not voluntarily thrust himself into public controversy, and any involvement was reactionary and limited. Plaintiff had no prior public exposure of note before April 2025 by choice. Plaintiff has not benefited financially from any publicity. Any publicity surrounding Plaintiff's disclosure came from other sources, was routed through counsel, and was limited in scope.

19. Defendant Elon Musk is a citizen of Texas. Defendant, upon information and belief, has since 2009 operated the Twitter (www.x.com) account "@elonmusk" and used that personal account to publish the April 19th Post. (Ex. A.)

## IV.  FACTUAL ALLEGATIONS

20. On April 19, 2025, at approximately 8:06 p.m. Eastern Time, Defendant posted on Twitter (www.x.com) a reply containing the text he wrote: "Filing a deliberately false whistleblower claim is a serious crime." (Ex. A.)

21. Defendant anchored that sentence directly above a linked preview card displaying Plaintiff's full name and Plaintiff's photograph (Ex. A), and then republished the combined content to the site.

22. The preview card linked to a comment quoting "amuse" that contained the text "NLRB WHISTLEBLOWER CAUGHT LYING ABOUT D.O.G.E. DATA BREACH" (Ex. A), which Defendant used to create a single statement.

23. Readers responded to the April 19th Post by identifying Plaintiff by name and demanding prosecution, jail, physical harm, arrest, or other punitive action. (Ex. B-1; Ex. B-2; Ex. B-3; Ex. B-4; Ex. B-5.)

24. Plaintiff's whistleblower disclosure followed all lawful restrictions and was purposefully entered as a sworn declaration under the penalty of perjury. In the spirit of actual transparency, Plaintiff ensured it contained technical exhibits and was careful not to overreach or falsely accuse, but rather to illustrate why it warranted a deeper look by an investigation. Plaintiff learned later that the document he submitted with the expectation of confidentiality was disseminated regardless and was publicly available in full from April 14, 2025 forward, meaning the disclosure was publicly accessible to Defendant for at least five days before the April 19th Post. (Ex. Y.)

25. The sworn declaration within that disclosure contained numbered factual assertions with dated, original, and independently verifiable object identifiers, network traffic graphs, and

related technical records. Plaintiff's declaration was intentionally limited to events personally observed by Plaintiff, first-hand conversations with identified NLRB employees, and third-party technical artifacts generated by Microsoft Azure and NLRB agency systems. The declaration expressly disclaimed drawing definitive conclusions, stating instead that the factual recitation simply identified "red flags" warranting investigation. The sworn disclosure contained technical assertions requiring specialized knowledge in cloud security architecture, Azure tenant administration, and network traffic analysis to evaluate. Upon information and belief, Defendant possesses no such expertise. Defendant cited no technical authority, independent analysis, or qualified source capable of evaluating the disclosure's assertions before characterizing them as "deliberately false." The accusation that Plaintiff filed a "deliberately false" whistleblower claim is therefore not supported by the text and nature of the disclosure itself and is baseless. (Ex. Z.)

26. On April 15, 2025, Representative Gerald Connolly publicly made available and transmitted a formal congressional oversight letter to the acting Inspector General of the Department of Labor and the Inspector General of the NLRB. The letter referenced Plaintiff's whistleblower disclosure, named Defendant directly, and identified the underlying concerns raised by the disclosure. The letter was also reported in national media before the April 19th Post. (Ex. J.)

27. The facts set forth in Paragraphs 28 through 31 below are pleaded in support of the falsity of Defendant's April 19th Post and Plaintiff's good-faith basis for the underlying whistleblower disclosure, and demonstrate that the concerns identified in Plaintiff's disclosure were substantiated by contemporaneous, independently documented events at the agency.

28. Upon information and belief, on April 15, 2025, representatives of the Department of Government Efficiency ("D.O.G.E.") communicated to the agency that they would be meeting at

NLRB headquarters on April 16, 2025 with agency leadership, including the acting general counsel, in attendance. Upon information and belief, at this meeting D.O.G.E. was read in on the agency's organizational structure. The agency, citing compliance with the President's executive order and applicable laws, agreed to comply with all of D.O.G.E.'s requested systems access, and to provide any information upon request going forward with PII removed. The agency was also informed that two employees of D.O.G.E. would be physically present at headquarters when they wanted for an unspecified period of months and would be performing their work in person and/or remotely accessing agency systems at unstated discretion. The agency's Executive Director, in a staff-wide communication on or about April 16, 2025, confirmed the above details to be true. (Ex. Q.)

29. Between April 9, 2025 and April 29, 2025, Plaintiff used remaining leave and with exception of one or two days was not physically present at NLRB offices. Plaintiff's government-issued work laptop and Plaintiff's government-issued mobile device remained in Plaintiff's office within NLRB headquarters throughout that period. Plaintiff did not possess any remote access capability to NLRB systems during that period, and did not possess any additional devices through which authentication to Plaintiff's NLRB account could be performed or attempted.

30. On or about April 14, 2025, Plaintiff and other NLRB staff received an official agency communication from the agency's Deputy Chief Information Officer, with the subject line "Adoption of Least Privilege Permissions," stating that "Security Administrator role assignment privileges have been removed from staff" and citing Zero Trust, FISMA, and security hardening initiatives as the stated basis. Plaintiff received additional similar agency communications during the same general period announcing the removal of other elevated permission types from staff

accounts, including global administrator, security reader, and user administrator roles. As a result of these communications and the actions they announced, the security reader, administrative, and other access privileges required for Plaintiff to perform Plaintiff's normal job functions were removed from Plaintiff's NLRB Microsoft Azure account. This occurred within the same general period as D.O.G.E.'s onboarding and access grant at the agency, as described in Paragraph 28.

31. Plaintiff's review of Plaintiff's own account activity logs, accessed through Plaintiff's own account, reflected multiple sign-in events associated with Plaintiff's NLRB Microsoft Azure account on dates corresponding to the period during which, D.O.G.E. was granted systems access by the agency. These sign-in events included both failed authentication attempts and successful authentications, and included successful sign-in events recorded as satisfying single and multi-factor authentication challenges associated with Plaintiff's account. These sign-in events occurred during a period in which Plaintiff was not physically present at NLRB, was not in possession of the devices through which such authentication could occur, and had no remote access capability. These sign-in events cannot be attributed to Plaintiff. Plaintiff reported these findings and provided supporting evidence to the agency's Office of Inspector General.

32. The U.S. Office of Special Counsel, in an official letter, stated that in addition to the NLRB Office of Inspector General's investigation, the National Aeronautics and Space Administration Office of Inspector General's Cybersecurity Forensic Investigation team had been requested to initiate or assist in an investigation into the incident alleged in the disclosure. (Ex. D.)

33. On April 20, 2025, the Prince William County Police Department responded to an emergency call near Plaintiff's residence involving Plaintiff's vehicle. The responding officer observed and photographed a cut in the brake line fluid tube on Plaintiff's vehicle. The police

department's intelligence unit was notified. Police report ending in 3793. In a supplemental report dated May 14, 2025, a mechanic who had repaired the vehicle's brake lines reported that the driver-side front impact/airbag sensor had also been removed but noted that the remaining wires had been spliced together, completing the circuit in a manner that prevented the vehicle from detecting or logging the missing component, while also preventing the vehicle from activating its safety protocols, alerting the driver, or engaging limp mode. Latent fingerprints were collected and the cut brake lines were saved as evidence. (Ex. G.)

34. At the time of the April 19th Post, no official determination had concluded that Plaintiff knowingly filed a false whistleblower disclosure. As of the filing date of this Complaint, Plaintiff is aware of no such adjudication, finding, or accusation being even remotely considered.

35. The April 19th Post cited no source with the authority or ability to make a determination that Plaintiff filed a deliberately false whistleblower claim. (Ex. A.)

36. Plaintiff made his disclosure in good faith. Plaintiff was placed in a reporting position by the implications of data he encountered during the normal course of his job functions, viewed through the lens of his cybersecurity training and the obligations of his oath. Plaintiff's conduct prior to the disclosure demonstrates good faith: Plaintiff attempted to resolve the anomalies internally, sought written attestation from agency leadership, involved personnel from multiple divisions, and followed industry standards to rule out false positives before submitting through official channels. Plaintiff is on record making a written request to an associate chief information officer on or around March 2025 requesting attestation from all individuals in the ACIO's chain of command that there was no legitimate system activity that could account for the anomalies during the times they presented. Plaintiff involved leaders from Security, Networking,

Development, Project Management, and Infrastructure, who all pressure-tested the factual nature of the data associated within their domain.

37. Plaintiff does not take lightly his duty to protect the data and systems the United States government entrusts to him and is aware that any mistruth would invalidate his clearance and carry criminal implications, and his disclosure specifically said it was to the best of his knowledge under penalty of perjury.

38. Independent reporting published before the April 19th Post documented that the "@amuse" account regularly shares falsehoods. On March 31st, 2025, PolitiFact published an investigation specifically titled "Anonymous X account shares falsehoods to Elon Musk, top US officials," which identified Defendant by name as the primary booster of the account, lists specific instances in which Defendant had boosted false claims originating with @amuse, and reported that the account itself publishes graphics bearing disclaimers labeled "accuracy confidence: normal" and "accuracy confidence: low." The PolitiFact investigation was published nineteen days before the April 19th Post. (Ex. K.)

39. Independent reporting before April 19th, 2025, described Defendant's repeated amplification of the Mario Nawfal source chain. (Ex. M.)

40. On or about April 24, 2025, Plaintiff reported the April 19th Post to the X platform's safety team. On April 29th, 2025, the platform responded that it had reviewed the Post and determined Defendant did not violate his own platform's safety policies. The Post remains published. (Ex. S.)

## V. FIRST CLAIM FOR RELIEF

### Defamation

41. Plaintiff incorporates all foregoing allegations.

42. Defendant published a false statement of fact to third parties by publishing the April 19th Post on his Twitter (www.x.com) account.

43. The statement was of and concerning Plaintiff. The preview card displayed Plaintiff's name and photograph. Readers in the thread identified Plaintiff by name. (Ex. A; Ex. B-1 through B-5.)

44. The statement accused Plaintiff of knowingly filing a deliberately false whistleblower claim and of committing a serious crime.

45. The accusation is defamatory per se because it imputes serious criminal conduct and injures Plaintiff in his profession.

46. The accusation was false. Plaintiff did not file a deliberately false whistleblower disclosure and did not commit a crime by submitting his disclosure.

47. Defendant acted at least negligently. To the extent Defendant argues that Plaintiff is a limited-purpose public figure, Plaintiff is prepared to show that Defendant acted with actual malice, including reckless disregard for whether the accusation was false. Defendant published the April 19th Post either without having read Plaintiff's disclosure, which was publicly available for five days before the Post and which incorporated Microsoft Azure platform telemetry, NLRB agency system records, and sworn statements from a named federal employee, or Defendant, having read the disclosure, its sworn factual assertions, and its accompanying technical exhibits, made his post with knowledge that the characterization of the disclosure as "deliberately false" was contradicted by the disclosure's own limited scope, named witnesses, and verifiable technical artifacts.

48. Plaintiff suffered damages as a direct and proximate result, including general damages, reputational harm, emotional distress, and actual economic damages. Plaintiff had a signed final offer of employment rescinded and, upon information and belief, the offer was rescinded because of the employer's discovery of the April 19th Post.

## VI.  SECOND CLAIM FOR RELIEF

### Defamation by Implication

49. Plaintiff incorporates all foregoing allegations.

50. Plaintiff pleads this Count under District of Columbia law and, in the alternative, under Maryland law, and tertiarily under Virginia law if appropriate.

51. The April 19th Post, by its wording, placement, and the attached preview card identifying Plaintiff by full name and photograph, communicated to ordinary readers that Plaintiff committed a serious crime by knowingly filing a deliberately false whistleblower claim. (Ex. A.)

52. Defendant personally authored and added the sentence "Filing a deliberately false whistleblower claim is a serious crime" to create a new statement. Neither the embedded preview card nor its underlying source attributed specific criminal conduct or a specific mental state to Plaintiff. Defendant's added sentence is what attributed mental state by using the word "deliberately," and it added a specific link to criminal illegality by using the specific phrase "a serious crime."

53. Readers drew the implication, as reflected in replies demanding prosecution, jail, harm, or arrest for Plaintiff. (Ex. B-1 through B-5.)

54. The implication was false. Plaintiff did not knowingly file a deliberately false whistleblower claim and did not commit any crime by submitting his disclosure.

55. Defendant acted at least negligently. To the extent that limited-purpose public figure status is assigned to Plaintiff, Plaintiff contends that Defendant acted with actual malice, including reckless disregard for whether the implication was false.

56. Plaintiff suffered damages as a direct and proximate result, including general damages, reputational harm, emotional distress, and actual economic damages, including direct employability impact.

## VII.  THIRD CLAIM FOR RELIEF

### Intentional Infliction of Emotional Distress

57. Plaintiff incorporates all foregoing allegations.

58. Plaintiff pleads this Count under District of Columbia law and, in the alternative, under Maryland law.

59. Defendant's conduct was extreme and outrageous. Defendant published a criminal accusation against a private individual, identified by full name and photograph, to an audience exceeding 200 million followers, without any independent verification, while Plaintiff's full sworn disclosure was publicly available, while a formal congressional oversight letter naming Defendant had already been publicly transmitted, and while multiple federal investigative bodies had opened inquiries into the same incident. This resulted in the foreseeable outcome in which Defendant's audience identified Plaintiff by name and publicly called for prosecution, imprisonment, physical harm, and arrest.

60. Defendant acted intentionally or recklessly. Defendant personally authored the criminal accusation, personally selected and attached the preview card identifying Plaintiff by name and photograph, and personally published the combined post. Defendant was aware of the scale and nature of his audience and the foreseeable consequences of publishing content of this character to that audience. Defendant published the April 19th Post either (a) without having read Plaintiff's disclosure, which was publicly available for five days before the Post and which incorporated Microsoft Azure platform telemetry, NLRB agency system records, and sworn statements from a named federal employee, or (b) having read the disclosure, its sworn factual assertions, and its accompanying technical exhibits, and with knowledge that the characterization of the disclosure as "deliberately false" was contradicted by the disclosure's own limited scope, named witnesses, and verifiable technical artifacts.

61. Plaintiff suffered severe emotional distress as a direct result of Defendant's conduct. This manifested in increased blood pressure requiring medication and a gastrointestinal bleed requiring medical treatment.

## VIII. FOURTH CLAIM FOR RELIEF

### Negligent Infliction of Emotional Distress

62. Plaintiff incorporates all foregoing allegations.

63. Plaintiff pleads this Count under District of Columbia law.

64. On April 14, 2025, Plaintiff's whistleblower disclosure was transmitted to multiple congressional offices and committees as appropriate. Later that day, the incident was reported on in a thorough and technical nature by NPR.

65.Between April 14th and April 29th, 2025, Plaintiff was absent from the agency's offices except for one day. Plaintiff communicated to his direct supervisor on April 20th, 2025, that he did not feel safe in the building with D.O.G.E. staffed on the same floor in the same building. Plaintiff communicated safety-related concerns to the agency's DCIO, Human Resources personnel, and the Office of Inspector General.

66.On April 19tt, 2025, Defendant published the April 19th Post identifying Plaintiff by name and photograph and containing the accusation of falsification, to an audience that has since reached approximately 41.2 million views.

67.The safety incident described above occurred within twenty-four hours of the April 19th Post.

68.At the time of and immediately surrounding the April 19th Post, Plaintiff was in a zone of danger.

69.Defendant owed Plaintiff a duty of reasonable care. When an individual with 200+ million followers publishes a criminal accusation identifying a specific named individual by name and photograph to that audience, it is foreseeable that some portion of that audience will react with harassment, threats, or violence directed at the named individual.

70. Defendant breached that duty by publishing the April 19th Post without verification.

71. Defendant's breach foreseeably increased the risk of physical harm to Plaintiff.

72.Plaintiff suffered fear for his own safety and serious, verifiable emotional distress, together with associated mitigation costs including vehicle repair, safety measures, and relocation expenses.

## IX.  SCOPE OF POST

73. Plaintiff contends that the April 19th Post was conducted outside the scope of Defendant's federal employment.

74. The April 19th Post was published from Defendant's personal Twitter (www.x.com) account, on a social media platform Defendant personally owns.

75. The April 19th Post was not issued through any official government communication channel.

## X. PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief as appropriate:

A. A declaration that Defendant's April 19, 2025 Post is false and defamatory;

B. Award compensatory damages in an amount to be proven at trial, exceeding $75,000;

C. Award general damages and, to the extent permitted by applicable law, presumed damages for the libel, which is actionable per se;

D. Award damages for both negligent infliction of emotional distress and intentional infliction of emotional distress in an amount to be proven at trial ;

E. Award punitive damages to the extent permitted by applicable law and constitutional limitations,

F. To the extent the Court awards punitive damages, Plaintiff respectfully requests that such damages be paid to a charitable organization supporting whistleblower legal defense, including but not limited to the Government Accountability Project, National Security Counselors, and the National Whistleblower Center, or other similar non-profit based organizations rather than to Plaintiff personally. ;

G. Award pre- and post-judgment interest as permitted by law;

H. Award costs and other relief as the Court deems just and proper;

I. If the Court concludes that venue or personal jurisdiction is lacking in this District, transfer this action in the interest of justice to a district in which it could have been brought rather than dismiss it; and

J. If deemed proper and within the Court's power, enter a permanent injunction requiring Defendant to remove the April 19th Post from the Twitter (www.x.com) platform.

## XI.  JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all issues so triable.

Dated: 4/17/26

Respectfully submitted to the court for consideration this day the 17th of April 2026,

/s/ Daniel J. Berulis

Daniel J. Berulis

Plaintiff, pro se

[Address filed under seal]

(501) 518-1469

Attachmenttoobig@gmail.com